SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Kareem T. Tillery** (A-37-17) (079832)

**Argued November 27, 2018 -- Decided June 19, 2019**

**PATTERSON, J., writing for the Court.**

Defendant Kareem T. Tillery was convicted of second-degree unlawful possession of a weapon and a fourth-degree offense. The jury was unable to reach a verdict on the remaining charges against him. The trial court sentenced defendant to an extended term, and the Appellate Division upheld defendant's conviction and sentence. The Court considers defendant's contention that the trial court improperly admitted into evidence his statement to police because he did not expressly or implicitly waive his rights under Miranda v. Arizona, 384 U.S. 436 (1966), before answering questions. Defendant also challenges his sentence, arguing that the court inappropriately considered his criminal record and evidence relating to charges as to which the jury failed to reach a verdict.

A cooperating informant advised the New Jersey State Police that defendant was involved in the sale of weapons. The lead investigators, Detectives Hugo Ribeiro and Miguel Holguin, arranged for the informant to conduct five controlled purchases from defendant. In each instance, the detectives met the informant at a secure site, searched him for contraband, equipped him with a recording device, and followed him to the location where he met defendant. They observed the informant and defendant at the location of the transaction and then retrieved from the informant the weapon purchased.

The fourth transaction was the sole transaction that gave rise to defendant's conviction. The informant testified that he arranged to purchase a .38 caliber handgun at defendant's residence in Union. Detective Eric Greener testified that he saw defendant leave his residence with a black plastic bag, enter the informant's car, remain in the car with the informant for four to five minutes, and return to his home without the plastic bag. The jury heard a conversation recorded by the informant in the car, in which defendant and the informant discussed a .38 caliber weapon. Following the transaction, officers recovered from the informant a loaded .38 caliber handgun.

After the fifth transaction, State Police detectives arrested defendant. After defendant was searched and briefly detained in a holding cell, Detective Ribeiro and Detective Holguin escorted him to an interrogation room and conducted an interview, which was audio-recorded and later transcribed.

1

Detective Ribeiro presented a Miranda card, on the front side of which the Miranda rights were set forth. The card's reverse side stated, "I acknowledge that I have been advised of the constitutional rights found on the reverse side of this card," followed by signature lines for the "Accused or Suspect," the "Advising Officer," and the "Witnessing Officer." After Detective Ribeiro read the rights to defendant, he said, "[j]ust sign here that I read you your rights," and "[b]y signing [the Miranda card] you are not admitting you're guilty or anything [it's] just that I read you your rights." Without comment, defendant reviewed and signed the card.

The conversation turned to the alleged transactions between defendant and the informant. Detective Ribeiro asked defendant about the first controlled purchase, and defendant contended that his role in that transaction was limited to connecting the cooperating informant with the owner of a gun that the informant had sought to purchase. In response to Detective Ribeiro's admonition that it was important for defendant to offer a credible statement, defendant replied, "I'm going to jail regardless alright . . . so what's the point[?]" The officers urged defendant to cooperate in their efforts to "get even more guns off the street," and defendant replied, "I know I can but uhhh it isn't make no point for me doing if I gotta go to jail." During the interrogation, Detective Ribeiro raised the topic of a handgun sale for which defendant was ultimately convicted. Defendant briefly discussed that transaction, focusing on the difficulty that he encountered paying the unidentified individual who supplied the weapon, and the modest profit that he made.

Defendant was charged in an eight-count indictment. Two of the counts derived in part from the fourth transaction. The State moved before the trial court for the admission into evidence of defendant's statement to police. Pursuant to N.J.R.E. 104(c), the trial court held a Miranda hearing. Detective Ribeiro testified that when defendant was questioned, he "appeared in good health," was "coherent," appeared to "understand his rights," and gave his statement voluntarily. On cross-examination, Detective Ribeiro conceded that after reading each Miranda warning, he did not ask defendant to read the warning aloud or ask defendant whether he understood the warning. He also acknowledged that he had instructed defendant to sign the card as an indication that the detective had read defendant his rights. The trial court acknowledged that the Miranda card included no inquiry regarding defendant's waiver. Nonetheless, it reasoned that waiver could be found "circumstantially by [defendant] continuing to answer and respond to questions." The court also cited defendant's comment that he was "going to jail regardless," viewing that remark to indicate that defendant understood he had the right to decide whether or not to answer the officers' questions. Conceding that it was unclear whether any of defendant's prior encounters with the criminal justice system involved the waiver of Miranda rights, the court generally relied on defendant's prior criminal record as underscoring the defendant's appreciation of his right not to speak with the investigators. The trial court found that the State had sustained its burden to prove beyond a reasonable doubt that defendant voluntarily, knowingly, and intelligently waived his Miranda rights and held the statement admissible.

At trial, the State presented the testimony of the informant and three investigators, as well as the transcripts of intercepted telephone calls, audio and video recordings relating to the controlled purchases, defendant's statement, and other evidence. The jury returned a verdict of guilty only as to the charges relating to the fourth transaction. The jury was unable to reach a verdict with respect to the other six counts of the indictment.

The State moved for the imposition of a discretionary extended term for defendant's conviction of second-degree unlawful possession of a weapon. The trial court found that defendant was exposed to a sentencing range of five to twenty years' incarceration. Citing United States v. Watts, 519 U.S. 148 (1997), the State asked the trial court to consider defendant's conduct in connection with the charges on which the jury did not return a verdict -- charges that remained pending at the outset of the sentencing proceeding. Relying in part on Watts, the trial court determined that in sentencing defendant, it could rely on "reliable and trustworthy" evidence relevant to the charges on which the jury had deadlocked. Citing the totality of the evidence, the court applied three aggravating factors and sentenced defendant to an extended term of twenty years. After the court sentenced defendant, the State moved to dismiss the counts as to which the jury had been unable to reach a verdict, and the court granted that motion.

The Appellate Division affirmed the trial court's judgment as to the waiver and upheld defendant's conviction. The Court granted certification. 232 N.J. 92 (2018).

**HELD:** The Court has significant concerns about the procedure followed in this case. Neither the script set forth on the Miranda card nor the detective's statement to defendant addressed whether defendant agreed to waive his rights before answering questions. However, any error in the trial court's admission of the statement was harmless beyond a reasonable doubt because the State presented overwhelming independent evidence of defendant's guilt. And, although the State should have moved to dismiss the charges on which the jury had deadlocked before the court considered evidence relevant to those charges, the trial court did not abuse its discretion in applying three aggravating factors to impose an extended-term sentence at the high end of the statutory range.

1. The Miranda warnings ensure that a defendant's right against self-incrimination is protected in the inherently coercive atmosphere of custodial interrogation. When the Supreme Court defined a suspect's rights during custodial interrogation in Miranda, it also addressed the waiver of those rights. 384 U.S. at 444. Under New Jersey law, the State must prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances. However, waiver need not be explicitly stated in order to be effective. Any clear manifestation of a desire to waive is sufficient. To determine the question of waiver, the trial court reviews the totality of the circumstances surrounding the custodial interrogation. The Court lists the factors typically considered in that analysis and agrees with the trial court that the majority of those favor a finding of implied waiver under the circumstances of this case. (pp. 21-25)

3

2.  The trial court, however, did not consider two aspects of the administration of the Miranda warnings in this case.  First, the Miranda card used by the New Jersey State Police investigators does not reflect optimal law-enforcement practice.  It did not guide an interrogating officer to ensure that the suspect had waived those rights before questioning began.  Consistent with Fifth Amendment jurisprudence and state law on the right against self-incrimination, Miranda cards and other written forms used by law enforcement in New Jersey should direct the interrogating officer to address the question of waiver in the Miranda inquiry.  The Court requests that the Attorney General review examples of Miranda waiver cards and forms in use by law-enforcement agencies in New Jersey, and make recommendations as to best practices on this issue.  Second, the advice that Detective Ribeiro gave defendant as to the purpose of his signature on the Miranda card was incomplete.  The detective told defendant that by signing the card, he would simply acknowledge that his Miranda rights had been read to him.  To the contrary, a defendant's signature on a Miranda card does much more than acknowledge that law enforcement has recited the Miranda rights.  When law enforcement officers request that a suspect sign a Miranda card or form, they should scrupulously avoid making comments that minimize the significance of the suspect's signature on that card or form.  Accordingly, although most of the "totality of the circumstances" factors support the trial court's finding of an implied waiver, the advice that law enforcement gave defendant regarding his constitutional rights weighs against such a finding in this case.  (pp. 25-27)

3.  The Court does not resolve the difficult question whether the admission of defendant's statement to police demands intervention because, in the unusual setting of this case, any error by the trial court in admitting defendant's statement was harmless beyond a reasonable doubt.  The evidence implicating defendant in the single weapon transaction for which he was convicted was overwhelming.  The Court recounts the evidence relating to the fourth transaction in detail and notes that defendant's statement contained little -- if any -- incriminating evidence relevant to that transaction.  When the evidence is viewed in its entirety, it is extremely unlikely that defendant's statement had an impact on the jury's determination on the single transaction relevant to this appeal.  Accordingly, the State has proven beyond a reasonable doubt that if the admission of defendant's statement constituted error, that error was harmless.  The Court therefore concurs with the Appellate Division's judgment affirming defendant's conviction.  (pp. 27-32)

4.  The Court reviews the requirements for imposing an extended-term sentence.  Here, the parties agree defendant was statutorily eligible for a discretionary extended term and that his sentence is within the permissible range.  Defendant bases his appeal on the application of aggravating factors to reach the upper end of that sentencing range.  He challenges the court's consideration of those factors in two respects.  (pp. 33-36)

5. First, defendant asserts that the court improperly cited his conduct relating to charges on which the jury deadlocked.  No Sixth Amendment or other constitutional principle, or statutory provision, generally bars a court from considering competent evidence

presented in support of charges -- even if the jury does not go on to convict defendant on those charges. Nevertheless, the Court has two concerns about the court's reliance on evidence pertaining to the four transactions as to which the jury deadlocked in this appeal. First, the charges relating to those four transactions were still pending when the court sentenced defendant. The Court cautions courts not to consider evidence pertaining to charges as to which a jury deadlocked in sentencing unless and until the defendant no longer faces the prospect of prosecution for those charges. Second, the trial court's reliance on <u>Watts</u> was misplaced because <u>Watts</u> did not involve the deadlocked-jury issue raised by this case. The Court concurs, however, with the Appellate Division's view that the evidence pertaining to charges on which the jury deadlocked was not dispositive in defendant's sentencing and finds that resentencing is not warranted. (pp. 36-39)

6. Second, defendant objects to the court's "duplicative" reliance on his criminal record both to deem him statutorily eligible for an extended term and to find aggravating factors six and nine. In <u>State v. Pierce</u>, the Court envisioned that the defendant's criminal record may be relevant in both stages of the sentencing determination. 188 N.J. 155, 168 (2006). The trial court properly considered defendant's criminal record in deciding defendant's statutory eligibility for an extended term, and in weighing aggravating and mitigating factors to determine that such a term was warranted. (pp. 39-40)

**The judgment of the Appellate Division is affirmed as modified.**

**CHIEF JUSTICE RABNER, concurring in part and dissenting in part,** agrees with the dissent that it was error to introduce defendant's post-arrest statements at trial because he cannot find that defendant waived his <u>Miranda</u> rights either explicitly or impliedly, but believes this is one of the very rare cases in which the erroneous admission of a defendant's post-arrest statement amounts to harmless error.

**JUSTICE ALBIN, dissenting,** would hold that the State's failure to prove beyond a reasonable doubt that defendant knowingly, intelligently, and voluntarily waived his rights requires the suppression of his confession. Justice Albin also finds that the State did not prove that the admission of defendant's confession was harmless beyond a reasonable doubt. Stressing case law under which courts are constrained to reverse convictions when there is some degree of possibility that a wrongly admitted confession led to an unjust verdict, Justice Albin expresses concern that finding harmless error in this case renders ineffectual the exclusionary rule and reduces the right against self-incrimination to a form of words.

**JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PATTERSON'S opinion. CHIEF JUSTICE RABNER filed an opinion concurring in part and dissenting in part, in which JUSTICE TIMPONE joins. JUSTICE ALBIN filed a dissenting opinion.**

SUPREME COURT OF NEW JERSEY

A-37 September Term 2017

079832

State of New Jersey,

Plaintiff-Respondent,

v.

Kareem T. Tillery, a/k/a
Kareem Ali Tillery, Kareem A. Tillery,
Kareem J. Tillery, Karim Tillery,
Kariem A. Tillery, Kareem Tillery-Jones
and Kareem R. Jones,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| November 27, 2018 | June 19, 2019 |

Michele E. Friedman, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michele E. Friedman, of counsel and on the briefs).

Sarah D. Brigham, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sarah D. Brigham, of counsel and on the briefs).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation,

attorneys; Alexander Shalom, Edward Barocas, and
Jeanne LoCicero, on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

Defendant Kareem T. Tillery was convicted of second-degree unlawful possession of a weapon and fourth-degree unlawful disposition of a weapon, arising from one of the five controlled purchases of weapons for which he was charged.  The jury was unable to reach a verdict on the remaining charges. The trial court sentenced defendant to a twenty-year extended-term sentence for the second-degree offense and a concurrent nine-month sentence for the fourth-degree offense, and granted the State's motion to dismiss the remaining charges against defendant.  The Appellate Division upheld defendant's conviction and sentence.

Defendant appeals his conviction on the ground that the trial court improperly admitted into evidence his statement to police.  He asserts that although a New Jersey State Police detective advised him of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), prior to his custodial interrogation, he did not expressly or implicitly waive those rights before answering questions.  Defendant also challenges his twenty-year extended-term sentence for the second-degree offense, arguing that the court inappropriately

considered his criminal record and evidence relating to charges as to which the jury failed to reach a verdict in applying three aggravating factors.

In a ruling entitled to substantial deference, the trial court concluded that the State had proven beyond a reasonable doubt that defendant voluntarily, knowingly, and intelligently waived his Miranda rights. The trial court relied on defendant's prior experience with the criminal justice system, his decision to sign a Miranda card after being read his rights, and a comment made by defendant that the court construed to suggest that defendant understood his right not to speak with police.

Despite those and other factors supporting the court's finding of a Miranda waiver, we have significant concerns about the procedure that was followed in this case. Neither the script set forth on the State Police Miranda card nor the detective's statement to defendant addressed whether defendant agreed to waive his rights before answering questions. Consequently, when we apply the totality-of-the-circumstances analysis that governs defendant's challenge to the admission of his statement, the parties' dispute over defendant's Miranda waiver presents a close question.

We conclude, however, that any error in the trial court's admission of the statement was harmless beyond a reasonable doubt. With respect to the single weapon transaction for which defendant was convicted -- an informant's

3

controlled purchase of a handgun from defendant -- the State presented overwhelming evidence of defendant's guilt, independent of defendant's statement. Accordingly, we concur with the Appellate Division's decision upholding defendant's conviction.

We also agree with the Appellate Division's determination affirming defendant's sentence. It is undisputed that defendant met the statutory criteria for a discretionary extended term. Although the State should have moved to dismiss the charges on which the jury had deadlocked before the court considered evidence relevant to those charges, we find no abuse of discretion in the court's application of three aggravating factors to impose an extended-term sentence at the high end of the statutory range.

Accordingly, we affirm as modified the Appellate Division's judgment.

## I.

### A.

We base our summary of the facts on the trial record.

In January 2013, a cooperating informant advised the New Jersey State Police that defendant was involved in the sale of weapons in Essex County. The Division of Criminal Justice authorized the State Police to consensually record telephone conversations between the informant and defendant.

4

The lead investigators, State Police Detectives Hugo Ribeiro and Miguel Holguin, arranged for the informant to conduct five controlled purchases of weapons from defendant. In each instance, the detectives met the informant at a secure site, searched him for contraband, and equipped him with a recording device. The detectives followed the informant as he drove to the location where he had agreed to meet defendant. They observed the informant and defendant at the location of the transaction and followed the informant back to the secure site designated for his meeting with the officers, ensuring that he made no stops on the way. On each occasion, the officers retrieved from the informant the weapon that he identified as a weapon purchased from defendant, and subjected him to a second search of his person and vehicle.

The first controlled purchase took place on February 12, 2013 in the Newark grocery store where defendant worked. According to Detective Ribeiro, in a monitored telephone conversation, defendant and the informant discussed the sale of a TEC-22 long rifle. Detective Ribeiro testified that he observed and videotaped defendant entering the grocery store carrying a white bag, and that the informant left the grocery store carrying the same bag. The detective stated that he later recovered from the informant a TEC-22 long rifle, two high-capacity magazines, and a sock filled with hollow-point bullets.

The second controlled purchase occurred on March 8, 2013, in the same grocery store. According to Detective Ribeiro and the informant, defendant sold the informant a .25 caliber handgun in the store. On that occasion, the recording device on the informant did not yield a clear recording, and no electronic record of that transaction was admitted into evidence. At the conclusion of the transaction, the detectives retrieved a loaded .25 caliber handgun from the informant.

The third controlled purchase, also in the Newark grocery store, occurred on March 28, 2013. According to the informant, he arranged by telephone to purchase a shotgun from defendant, who retrieved a duffel bag from the rear of the building when the informant arrived at the store. Again, the recording device failed to produce an understandable recording of the conversation between the informant and defendant, and no recording of that transaction was admitted into evidence. After leaving the grocery store, the informant turned over to the investigators a Mossberg shotgun, which he identified as the weapon purchased from defendant.

The fourth transaction -- the sole transaction that gave rise to defendant's conviction -- occurred on April 3, 2013. The informant testified that he arranged to purchase a .38 caliber handgun at defendant's residence in

6

Union, a location familiar to him from prior visits.[1]  Detective Eric Greener,

assigned to observe the informant and defendant from a location near

defendant's home, testified that he saw defendant leave his residence with a

black plastic bag, enter the informant's car, remain in the car with the

informant for four to five minutes, and return to his home without the plastic

bag.  The jury heard a conversation recorded by the informant in the car, in

which defendant and the informant discussed a .38 caliber weapon.  Following

the transaction, officers recovered from the informant a loaded .38 caliber

handgun.

The last of the five controlled purchases alleged by the State occurred at

the Newark grocery store on April 29, 2013.  By the informant's account, he

and defendant met at the back of the store and discussed the sale of a single

handgun and, although they initially disputed the terms of the transaction, they

eventually agreed on a price.  The recording device failed to produce a

complete recording of the conversation between the informant and defendant,

but it captured brief comments about the price.  Detective Ribeiro testified that

the informant entered the grocery store carrying nothing, and emerged from it

---

[1]  During the informant's testimony about the April 3, 2013 transaction, the jury was informed that he had faced two pending criminal charges and received more favorable treatment in connection with those charges because of his cooperation in the investigation of defendant.

carrying a black bag, from which the officers recovered a .44 caliber handgun loaded with four hollow-point bullets.

## B.

State Police detectives arrested defendant at the Newark grocery store on August 22, 2013, and transported him to the Metro North Station in Irvington. After defendant was searched and briefly detained in a holding cell, Detective Ribeiro and Detective Holguin escorted him to an interrogation room and conducted an interview, which was audio-recorded and later transcribed.[2]

After asking defendant about his background and employment, Detective Ribeiro presented a <u>Miranda</u> card labeled, "S.P. 429 (Rev. 11-73)." On the front side of the card, the <u>Miranda</u> rights were set forth. The card's reverse side stated, "I acknowledge that I have been advised of the constitutional rights found on the reverse side of this card," followed by signature lines for the "Accused or Suspect," the "Advising Officer," and the "Witnessing Officer," as well as spaces to record the date and time.

Evidently reading from the <u>Miranda</u> card, Detective Ribeiro advised defendant:

> I'm gonna read you your rights ok alright you have the right to remain silent and refuse to answer any questions. Anything you say may be used against you

---

[2] Detective Ribeiro later testified that the Metro North Station's interview facilities lacked video-recording capability.

8

in a court of law. You have the right to consult with an attorney at any time and have him present before and during questioning. If you cannot afford an attorney one will be provided if you so desire prior to any questioning. A decision to waive these rights is not final and you may withdraw your waiver whenever you wish.

Detective Ribeiro then said to defendant, "[j]ust sign here that I read you your rights and 8/22/13 at 18:50 hours," and "[b]y signing [the Miranda card] you are not admitting you're guilty or anything [it's] just that I read you your rights." Without comment, defendant reviewed and signed the Miranda card.

Detective Ribeiro then explained that defendant had been arrested for possession of "several guns" now in police custody, and that the officers wanted to work "to keep you out of jail and . . . for us to get guns off the street that's my goal." Defendant asked whether he would "get a bail or . . . get released from here." Detective Ribeiro responded that "we're gonna work toward you getting a bail ok" and that "more than likely . . . you will get bail," but cautioned that bail is set by a judge, not a police officer.

The conversation turned to the alleged transactions between defendant and the informant. Detective Ribeiro asked defendant about the first controlled purchase, conducted on February 12, 2013. Defendant contended that his role in that transaction was limited to connecting the cooperating informant with the owner of a gun that the informant had sought to purchase.

9

In response to Detective Ribeiro's admonition that it was important for defendant to offer a credible statement, defendant replied, "I'm going to jail regardless alright . . . so what's the point[?]" The officers urged defendant to cooperate in their efforts to "get even more guns off the street," and defendant replied, "I know I can but uhhh it isn't make no point for me doing if I gotta go to jail."

In his questioning of defendant, Detective Ribeiro focused on identifying individuals who supplied, or offered to supply, the various weapons that defendant was alleged to have sold to, or discussed with, the informant. Defendant did not identify any supplier by name. The conversation between the detective and defendant rapidly shifted from transaction to transaction, and focused in part on a general discussion of weapons trafficking in Essex County. With the exception of defendant's alleged sale of a weapon to the informant on February 12, 2013, no transaction was identified by date in Detective Ribeiro's questions or in defendant's responses to those questions.[3]

During the interrogation, Detective Ribeiro raised the topic of a handgun sale at defendant's home -- an apparent reference to the April 3, 2013

---

[3] The audio-recording of the interview suggests that Detective Ribeiro showed defendant various weapons during the interview. The detective, however, did not identify each weapon as he showed it to defendant, so it is unclear what weapon is being discussed at each stage of the questioning.

10

transaction for which defendant was ultimately convicted. Defendant briefly discussed that transaction, focusing on the difficulty that he encountered paying the unidentified individual who supplied the weapon, and the modest profit that he made on the sale.

## C.

Defendant was charged in an eight-count indictment. Two of the counts derived in part from defendant's alleged sale of the .38 caliber handgun on April 3, 2013: second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and fourth-degree unlawful disposition of a weapon, N.J.S.A. 2C:39-9(d). The remaining six counts related only to the four weapon transactions alleged to have taken place at the Newark grocery store.

The State moved before the trial court for the admission into evidence of defendant's statement to police. Defendant opposed the motion, arguing in part that, because he did not validly waive his Miranda rights, the court should suppress his entire statement.

Pursuant to N.J.R.E. 104(c), the trial court held a Miranda hearing. Detective Ribeiro, the sole witness at the hearing, described defendant's arrest, the setting of his interrogation, and the reading of defendant's Miranda rights. The detective testified that when defendant was questioned, he "appeared in good health," was "coherent," appeared to "understand his rights," and gave

11

his statement voluntarily. Detective Ribeiro testified that he and Detective Holguin did not make promises to defendant, coerce him, or threaten him in order to secure his statement.

On cross-examination, Detective Ribeiro conceded that after reading each Miranda warning, he did not ask defendant to read the warning aloud or ask defendant whether he understood the warning. Detective Ribeiro also acknowledged that he had instructed defendant to sign the card as an indication that the detective had read defendant his rights.

At the N.J.R.E. 104(c) hearing, the trial court acknowledged that the Miranda card read to defendant included no inquiry regarding defendant's waiver. Nonetheless, it reasoned that waiver could be found "circumstantially by [defendant] continuing to answer and respond to questions." The court also cited defendant's comment that he was "going to jail regardless," viewing that remark to indicate that defendant understood he had the right to decide whether or not to answer the officers' questions. Conceding that it was unclear whether any of defendant's prior encounters with the criminal justice system involved the waiver of Miranda rights, the court generally relied on defendant's prior criminal record as evidence that he was "not unsophisticated in criminal investigations or interactions with police," thus underscoring the defendant's appreciation of his right not to speak with the investigators.

12

The trial court found that the State had sustained its burden to prove beyond a reasonable doubt that defendant voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights, and that there was no evidence that the statement was the product of coercion or duress.  Accordingly, it held the statement admissible.

D.

The court conducted an eight-day jury trial.  During the trial, defendant conveyed through his counsel that he did not recognize "the Constitution and the authority of the State of New Jersey to move forward with these charges against him."  He declined to answer questions posed by the trial court.

The State presented the testimony of the informant and three investigators, as well as the transcripts of intercepted telephone calls, audio and video recordings relating to the controlled purchases, defendant's statement, and other evidence.  Defendant did not testify and presented no evidence.

After four days of deliberations, the jury returned a verdict of guilty only as to the charges of second-degree unlawful possession of a weapon, and fourth-degree unlawful disposition of a weapon, insofar as those charges related to a weapon identified on the verdict sheet as a "Smith & Wesson .38 Caliber."  Accordingly, defendant was convicted only of charges relating to

the April 3, 2013 controlled purchase by the informant, whom he met outside his home. The jury was unable to reach a verdict with respect to the charges of second-degree unlawful possession of a weapon and fourth-degree unlawful disposition of a weapon as they related to other weapons, or the remaining six counts of the indictment.

## E.

Pursuant to N.J.S.A. 2C:44-3(a), the State moved for the imposition of a discretionary extended term for defendant's conviction of second-degree unlawful possession of a weapon contrary to N.J.S.A. 2C:39-5(b). The trial court found defendant to be a persistent offender within the meaning of N.J.S.A. 2C:44-3(a). Relying on State v. Pierce, 188 N.J. 155, 169 (2006), the court found that defendant was exposed to a sentencing range of five to twenty years' incarceration.

Citing United States v. Watts, 519 U.S. 148 (1997), and an unpublished Appellate Division decision, the State asked the trial court to consider defendant's conduct in connection with the charges on which the jury did not return a verdict -- charges that remained pending at the outset of the sentencing proceeding. Relying in part on Watts and the unpublished decision, the trial court determined that in sentencing defendant, it could rely on "reliable and trustworthy" evidence relevant to the charges on which the jury had

14

deadlocked, as well as the charges of which he had been convicted. The court found that "the totality of th[e] evidence, the surveillance by the officers, the testimony of [the cooperating informant], [and] the acknowledgement by the defendant in his post-arrest statement[,] establishes clearly beyond a preponderance of the evidence . . . the defendant's involvement in each and every one of those transactions."

The court applied aggravating factor three, N.J.S.A. 2C:44-1(a)(3), "[t]he risk that the defendant will commit another offense," based on defendant's juvenile adjudications, prior criminal convictions, and history of offending while on probationary status.[4] The court observed that probationary supervision had not deterred defendant from criminal activity.

The court also applied aggravating factor six, N.J.S.A. 2C:44-1(a)(6), "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted," invoking the State's strong policy

---

[4] According to defendant's Presentence Report, between May 2002 and September 2002, defendant, then a juvenile, was adjudicated delinquent for conduct on two occasions that, if committed by an adult, would constitute theft by unlawful taking and for improper behavior. In February 2003, defendant was adjudicated delinquent for conduct that, if committed by an adult, would constitute resisting arrest, and was sentenced to a two-year term of incarceration. He also had a record of adult convictions. In October 2005, in accordance with a plea agreement, defendant pled guilty in a Virginia court to several counts of grand larceny and was sentenced to ten years' incarceration in Virginia. Lastly, in April 2012, defendant was sentenced to a two-year term of probation for possession of a controlled dangerous substance.

15

on gun control to protect the public; defendant's sales of firearms to the cooperating informant, an "unfit individual" with prior convictions; and the gravity of defendant's offenses.

The trial court also applied aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), "[t]he need for deterring the defendant and others from violating the law." In that regard, the court relied on defendant's failure to show remorse for any of his multiple weapon sales, finding that defendant had not acknowledged responsibility for any of the transactions for which he was charged. The court also relied on defendant's statement that he was not subject to the court's jurisdiction; it characterized defendant as a "sovereign citizen."[5] Defendant disputed that characterization.

The court rejected defendant's request that it apply mitigating factor one, N.J.S.A. 2C:44-1(b)(1), "[t]he defendant's conduct neither caused nor threatened serious harm," again citing the importance of gun control,

---

[5] See United States v. Weast, 811 F.3d 743, 746 n.5 (5th Cir. 2016) ("The sovereign citizen movement is a loose grouping of litigants, commentators, and tax protesters who often take the position that they are not subject to state or federal statutes and proceedings."); United States v. Brown, 669 F.3d 10, 18 n.12 (1st Cir. 2012) (observing that members of the sovereign citizen movement "reject most forms of taxation as illegitimate[] and place special significance in commercial law"). The court later supplemented the sentencing record with a document identified as a letter written by defendant to another judge in the same vicinage, in which defendant objected to being "adjudicated under this commercial law jurisdiction" and claimed a "divine and inalienable right as a one-man sovereign nation."

defendant's ineligibility to legally own weapons by virtue of his criminal record, and defendant's sale of a weapon to the informant, who could not legally own that weapon.

Finally, the court declined to apply mitigating factor eight, N.J.S.A. 2C:44-1(b)(8), "[t]he defendant's conduct was the result of circumstances unlikely to recur." The court noted that defendant's request for that mitigating factor was based on a representation to his counsel that had not been explained on the record, and deemed it "virtually certain" that defendant would reoffend unless incarcerated.

The court sentenced defendant to an extended term of twenty years' incarceration, with ten years' parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6, on his conviction of second-degree unlawful possession of a weapon. For defendant's conviction of fourth-degree unlawful disposition of a weapon, the court sentenced defendant to a term of nine months' incarceration, to run concurrently with his twenty-year term of incarceration for the second-degree offense.

Immediately after the trial court sentenced defendant, the State moved to dismiss the counts of the indictment as to which the jury had been unable to reach a verdict. The trial court granted that motion.

F.

Defendant appealed his conviction and sentence. The Appellate Division affirmed the trial court's judgment.

The Appellate Division rejected defendant's argument that a defendant may waive <u>Miranda</u> rights only by an express statement. Applying the "totality of the circumstances" approach of prior case law to the question of waiver, the court held that the State had met its burden to prove beyond a reasonable doubt that defendant, understanding that he had a constitutional right not to speak to police, made a voluntary statement, and that the statement was not the product of coercion or duress.

The Appellate Division also upheld defendant's sentence. It reasoned that in its application of aggravating and mitigating factors, the trial court did not rely exclusively on defendant's conduct in connection with the charges as to which the jury did not reach a verdict, but had considered other factors as well. It also noted that sentencing judges are permitted to consider material that would be inadmissible at trial as long as it is relevant and trustworthy.

We granted defendant's petition for certification. 232 N.J. 92 (2018). We also granted the application of the American Civil Liberties Union of New Jersey (ACLU) to appear as amicus curiae.

18

## II.

### A.

Defendant argues that the State failed to prove beyond a reasonable doubt that he waived his <u>Miranda</u> rights before giving his statement.  He contends that under New Jersey law, a defendant should not be deemed to have waived his or her <u>Miranda</u> rights absent an express waiver.  Defendant asserts that his sentence was manifestly excessive because the trial court improperly considered conduct relating to the charges as to which the jury was deadlocked, thus denying defendant the presumption of innocence.  He claims that the trial court attempted to reverse what it considered an unjust verdict contrary to the Appellate Division's holding in <u>State v. Tindell</u>, 417 N.J. Super. 530, 556 (App. Div. 2011).

### B.

The State urges the Court to reaffirm New Jersey's adherence to a "totality of the circumstances" test for a <u>Miranda</u> waiver which allows for a finding of implied waiver.  It asserts that it met its burden to prove beyond a reasonable doubt that defendant voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights.  Alternatively, the State argues that any error in the admission of defendant's statement was harmless beyond a reasonable doubt. The State contends that the trial court properly exercised its discretion in

sentencing defendant within the statutory range for an extended term and that it was not error for the court to consider all of the evidence of defendant's conduct when it weighed the aggravating and mitigating factors.

## C.

The ACLU, limiting its argument to the sentencing issue, contends that a court's reliance on charges as to which a jury deadlocked violates the New Jersey Constitution, even if such reliance comports with federal law. The ACLU also asserts that the trial court improperly relied on defendant's denial of the charges as evidence of a lack of remorse, and on his alleged status as a "sovereign citizen," which defendant denies.

## III.

## A.

We review the trial court's factual findings as to defendant's <u>Miranda</u> waiver in accordance with a deferential standard. We consider whether those findings are "supported by sufficient credible evidence in the record." <u>State v. S.S.</u>, 229 N.J. 360, 374 (2017) (quoting <u>State v. Gamble</u>, 218 N.J. 412, 424 (2014)). "[A] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" <u>State v. A.M.</u>, 237 N.J. 384, 395 (2019) (quoting <u>State v. Elders</u>, 192 N.J. 224, 244 (2007)). That standard governs appellate review even when

20

the trial court's findings are premised on a recording or documentary evidence that the appellate court may also review. S.S., 229 N.J. at 380-81. To the extent that a trial court determination involved legal conclusions, we review those conclusions de novo. A.M., 237 N.J. at 396.

B.

This appeal implicates the right against self-incrimination, "guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. Nyhammer, 197 N.J. 383, 399 (2009).

In Miranda, the United States Supreme Court held that before law enforcement subjects a suspect to custodial interrogation, the suspect must be advised: (1) "that he has the right to remain silent"; (2) "that anything he says can be used against him in a court of law"; (3) "that he has the right to the presence of an attorney"; and (4) "that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479. Miranda imposes a fifth requirement: "that a person must be told that he can exercise his rights at any time during the interrogation." Ibid.

The Miranda warnings ensure "that a defendant's right against self-incrimination is protected in the inherently coercive atmosphere of custodial interrogation." A.M., 237 N.J. at 397. As we have observed, "[t]he essential

21

purpose of <u>Miranda</u> is to empower a person -- subject to custodial interrogation within a police-dominated atmosphere -- with knowledge of his basic constitutional rights so that he can exercise, according to his free will, the right against self-incrimination or waive that right and answer questions." <u>Nyhammer</u>, 197 N.J. at 406 (citing <u>Miranda</u>, 384 U.S. at 456-57).

When the Supreme Court defined a suspect's rights during custodial interrogation in <u>Miranda</u>, it also addressed the waiver of those rights; it held that "[t]he defendant may waive effectuation of [those] rights, provided the waiver is made voluntarily, knowingly, and intelligently." <u>Miranda</u>, 384 U.S. at 444. Under federal Fifth Amendment law, the government must prove by a preponderance of the evidence that the suspect's waiver was made voluntarily, knowingly, and intelligently. <u>Missouri v. Seibert</u>, 542 U.S. 600, 608 n.1 (2004); <u>State v. O'Neill</u>, 193 N.J. 148, 168 n.12 (2007). New Jersey law holds the State to a standard of proof more stringent than that imposed by federal Fifth Amendment law; the State must "prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances." <u>State v. Presha</u>, 163 N.J. 304, 313 (2000); <u>see also</u> <u>A.M.</u>, 237 N.J. at 397; <u>Nyhammer</u>, 197 N.J. at 401 & n.9.

Our law, however, does not require that a defendant's <u>Miranda</u> waiver be explicitly stated in order to be effective. "A waiver may be 'established even

22

absent formal or express statements.'" A.M., 237 N.J. at 397 (quoting

Berghuis v. Thompkins, 560 U.S. 370, 383 (2010)).  Indeed, "[a]ny clear

manifestation of a desire to waive is sufficient."  Ibid. (alteration in original)

(quoting State v. Hartley, 103 N.J. 252, 313 (1986)); see also State v.

Kremens, 52 N.J. 303, 311 (1968); Kevin G. Byrnes, N.J. Arrest, Search &

Seizure § 28:2-1 (2019) (noting that under New Jersey law, "a waiver may be

inferred from the particular factual circumstances following the proper

administration of Miranda warnings to a suspect in custody").

To determine the question of waiver, the trial court reviews "the totality

of the circumstances surrounding the custodial interrogation."  A.M., 237 N.J.

at 398.  "The criterion is not solely the language employed but a combination

of that articulation and the surrounding facts and circumstances."  Kremens, 52

N.J. at 311.  "Where the prosecution shows that a Miranda warning was given

and that it was understood by the accused, an accused's uncoerced statement

establishes an implied waiver of the right to remain silent."  Berghuis, 560 U.S. at

384.

There is substantial overlap between the factors that govern a court's

determination of whether a Miranda waiver is valid and the factors that a court

considers in its separate assessment of the voluntariness of a confession.  See

Colorado v. Connelly, 479 U.S. 157, 169-70 (1986) (finding "no reason to require

23

more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context" and explaining that "[t]he sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion").  In the inquiry as to the validity of a waiver, "[f]actors commonly considered include the suspect's intelligence and education, age, familiarity with the criminal justice system, physical and mental condition, and drug and alcohol problems."  46 Geo. L.J. Ann. Rev. Crim. Proc. 3, 230-33 (2017) (footnotes omitted); see also A.M., 237 N.J. at 398 (citing the suspect's age, education and intelligence among factors to be considered in the waiver inquiry).  In addition, courts consider "the explicitness of the waiver, language barriers, and the time lapse between the reading of Miranda rights and the actual questioning or incriminating oral statement."  46 Geo. L.J. Ann. Rev. Crim. Proc. at 233-34 (footnotes omitted).  Courts may take into account other factors that are pertinent to a given case.

## C.

Guided by those principles, we review the trial court's finding that the State met its burden to prove beyond a reasonable doubt that defendant voluntarily, knowingly, and intelligently waived his Miranda rights.

As noted above, see supra Section I.C., at the N.J.R.E. 104(c) hearing, the court found that a number of factors supported the State's argument that defendant

implicitly waived his <u>Miranda</u> rights.  The court cited defendant's continuing response to questions, his comment that he was "going to jail regardless," and his criminal record.

Other factors not cited by the trial court also support a finding of implied waiver in this case.  Defendant was twenty-eight years old at the time of the interrogation.  Although he was not a high school graduate, defendant spoke fluently and assertively, confidently challenging some of Detective Ribeiro's comments.  When he spoke with the State Police investigators, defendant had been detained at the Metro North Station for only about twenty minutes.  Moreover, only five minutes elapsed between the administration of the <u>Miranda</u> warnings and defendant's first substantive response to a question.  In short, we agree with the trial court that the majority of the factors typically considered in the "totality of the circumstances" inquiry favor a finding of implied waiver.

The trial court, however, did not consider two aspects of the administration of the <u>Miranda</u> warnings in this case.  First, the <u>Miranda</u> card used by the New Jersey State Police investigators does not reflect optimal law-enforcement practice.  The card accurately recited a suspect's <u>Miranda</u> rights, and mentioned the waiver of <u>Miranda</u> rights in a sentence advising a suspect that his or her decision to waive those rights is not final and may be

25

withdrawn.  It did not guide an interrogating officer, however, to ensure that the suspect had waived those rights before questioning began.  Instead, the card ambiguously stated that by signing, the suspect acknowledged that he or she had been "advised of the constitutional rights found on the reverse side of this card."  In short, the <u>Miranda</u> card used in this case invited an incomplete inquiry on the question of waiver.

Consistent with Fifth Amendment jurisprudence and state law on the right against self-incrimination, <u>Miranda</u> cards and other written forms used by law enforcement in New Jersey should direct the interrogating officer to address the question of waiver in the <u>Miranda</u> inquiry.  <u>Miranda</u> waiver cards and forms should guide an officer to ask whether the suspect understands his or her rights, and whether, understanding those rights, he or she is willing to answer questions.  We request that the Attorney General review examples of <u>Miranda</u> waiver cards and forms in use by law-enforcement agencies in New Jersey, and make recommendations as to best practices on this issue.

Second, the advice that Detective Ribeiro gave defendant as to the purpose of his signature on the <u>Miranda</u> card was incomplete.  Perhaps misled by the language of the <u>Miranda</u> card, the detective told defendant that by signing the card, he would simply acknowledge that his <u>Miranda</u> rights had

26

been read to him. He urged defendant to "[j]ust sign here that I read you your rights."

To the contrary, a defendant's signature on a Miranda card does much more than acknowledge that law enforcement has recited the Miranda rights. When law enforcement officers request that a suspect sign a Miranda card or form, they should scrupulously avoid making comments that minimize the significance of the suspect's signature on that card or form.

Accordingly, although most of the "totality of the circumstances" factors support the trial court's finding of an implied waiver, the advice that law enforcement gave defendant regarding his constitutional rights weighs against such a finding in this case.

D.

To decide this appeal, we need not resolve the difficult question whether the trial court's decision admitting into evidence defendant's statement to police was "so clearly mistaken -- so wide of the mark -- that the interests of justice demand intervention." S.S., 229 N.J. at 381. We conclude that, in the unusual setting of this case, any error by the trial court in admitting defendant's statement was harmless beyond a reasonable doubt. See R. 2:10-2 (stating the general standard for appellate review of alleged error); Chapman v. California, 386 U.S. 18, 24 (1967) (expounding the "harmless beyond a

27

reasonable doubt" standard for cases implicating constitutional error); see also State v. Maltese, 222 N.J. 525, 550 (2015) (applying the "harmless beyond a reasonable doubt" standard to the defendant's assertion that police officers violated his Miranda rights in his interrogation).

The evidence implicating defendant in the single weapon transaction for which he was convicted -- the April 3, 2013 sale of a .38 caliber handgun to the informant -- was overwhelming. The cooperating informant testified that he spoke with defendant by telephone to arrange the purchase of a .38 caliber handgun at defendant's home in Union. He stated that he was familiar with defendant's home because he had been there before to attend a party and to see defendant. According to Detective Ribeiro, before the informant proceeded to defendant's home to buy the gun, the informant met with Detective Ribeiro, who searched him for contraband, provided him with money to purchase the weapon, and outfitted him with a recording device. The detective stated that he followed the informant to defendant's home.

In contrast to the four transactions that allegedly took place inside the Newark grocery store with no officers present, the April 3, 2013 transaction was conducted in a vehicle under visual surveillance by one of the investigating officers. Detective Greener, located "in very close proximity" to defendant's home, testified that he observed the informant arrive by car at the

28

residence. He stated that he then saw defendant, whom he recognized from a photograph, leave his home carrying a black plastic bag. Detective Greener watched as defendant entered the informant's car through the passenger door. According to Detective Greener, after spending four or five minutes with the informant in the vehicle, defendant "exited and went back into . . . his front door," carrying nothing.

The recording device, which functioned effectively during the April 3, 2013 transaction, memorialized an incriminating conversation between defendant and the informant. Defendant told the informant that he was "sticking my neck out for you," and that he did not have the money for the transaction. He complained to the informant, "I could see if I was making something," and characterized an unidentified individual as "greedy as hell." The informant also complained about the financial terms of the transaction; he told defendant that "this is killing me . . . I'm mak[ing] a little bit of money but dam[n] bro what is it anyway." Defendant replied, "three eight." The informant replied, "[t]hree eight is loaded ah shit I ain't touching that shit fuck." Defendant warned the informant that the weapon was not only loaded but cocked, and when the informant asked why it was cocked, defendant said, "I don't know." The informant verified the accuracy of the recording, and

Detective Ribeiro testified that the voices on the recording were the voices of defendant and the informant.

At trial, the informant identified the weapon that he purchased from defendant on April 3, 2013, and testified that when he bought the weapon from defendant, it was "loaded and ready to shoot." He also identified for the jury the container in which defendant delivered the handgun to him.

In addition to Detective Greener's testimony, discussed earlier, Detective Ribeiro testified that he followed the informant as he drove from defendant's residence to a predetermined location, that the informant made no stops along the way, and that he met with the informant at the location. He stated that he recovered from the informant's vehicle a black plastic bag. From the bag, Detective Ribeiro retrieved a "white foam container," and found in that container a loaded .38 caliber revolver.

The State thus presented compelling proof of defendant's April 3, 2013 sale of a handgun that was independent of any admission by defendant in his statement to police. The testimony of the cooperating informant, the testimony of the officers, the recorded conversation, and the physical evidence gave the jury a detailed account of the sole controlled purchase that led to a conviction in this case.

In contrast to that clear evidence, defendant's statement to police contained little -- if any -- incriminating evidence relevant to the April 3, 2013 transaction. To the extent that Detective Ribeiro and defendant appeared to discuss that transaction, the focus of their conversation was on a problem defendant encountered in paying the supplier of the weapon.

Detective Ribeiro stated, "[n]ow let me ask you this . . . I'm a little unclear about this like this one was at your house." Defendant answered, "[u]m hum." Detective Ribeiro asked whether defendant "had to front the money initially to this guy," which defendant affirmed without identifying the "guy" being discussed. Defendant stated that the money "wasn[']t my money it was the store's money but I had to put it right back so I made a hundred dollars." He said that he had to "front" nine hundred dollars. Defendant indicated that he carried the weapon in a cab, and said that an unidentified "dude" accompanied him on the cab ride, because defendant was short two hundred dollars and had to retrieve money from his home. Defendant said that he had charged the cooperating informant one thousand dollars and "just made a hundred" after he returned the money he had taken "from the store."

In what may also be a reference to the same transaction, Detective Ribeiro later commented, "you also have one that . . . was a thirty eight it's like a chrome gun with tape around the handle." Defendant responded,

31

"[f]rom a dude up the street this time for 18th Ave," and said it was a "different guy." The detective and defendant then discussed the description of the unnamed "dude" and "guy."

Those oblique exchanges stand in stark contrast to the clear and comprehensible timeline of that transaction presented at trial through the testimony of the State's witnesses and the recorded conversations between the informant and defendant. In defendant's statement, neither Detective Ribeiro nor defendant revealed the date of the weapon sale that they discussed. Indeed, their comments were untethered to any identifying information, other than the location of what the detective called "this one" at defendant's home.

The statement could do little to advance the State's otherwise comprehensive case against defendant regarding the April 3, 2013 sale of a handgun. When the evidence is viewed in its entirety, it is extremely unlikely that defendant's statement had an impact on the jury's determination on the single transaction relevant to this appeal.

Accordingly, we hold that the State has proven beyond a reasonable doubt that if the admission of defendant's statement constituted error, that error was harmless. We therefore concur with the Appellate Division's judgment affirming defendant's conviction.

32

IV.

A.

We next review defendant's contention that his sentence was excessive. In that inquiry, we "must not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). We affirm a trial court's sentencing determination unless: "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found . . . were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). As this Court has stated, "[t]he critical focus of the appellate power to review and correct sentences is on whether the basic sentencing determination of the lower court was 'clearly mistaken.'" State v. Jarbath, 114 N.J. 394, 401 (1989).

B.

When, as here, the State requests that a court sentence a defendant to a discretionary extended term, the court must decline that request "unless the ground therefor has been established at a hearing after the conviction of the defendant and on written notice to the defendant of the ground proposed." N.J.S.A. 2C:43-7.1(d). The court's first task is to "review and determine

33

whether [a defendant's] criminal record of convictions renders him . . .

statutorily eligible" for an extended term. Pierce, 188 N.J. at 168.[6] To be

eligible for a discretionary extended term, a defendant must be:

> a person who at the time of the commission of the crime is 21 years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least 18 years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within 10 years of the date of the crime for which the defendant is being sentenced.
>
> [N.J.S.A. 2C:44-3(a).]

---

[6] Prior to our decision in Pierce, sentencing courts were required to "examine whether, in order to protect the public, imposition of an extended sentence [was] necessary" to determine a defendant's eligibility for a discretionary extended term." 188 N.J. at 164 (citing State v. Dunbar, 108 N.J. 80, 90-91 (1987)). In response to a challenge to that practice as a violation of the defendant's Sixth Amendment right to a jury trial under the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004), we held that a determination as to the need to protect the public should not be made until the court has determined the defendant to be statutorily eligible for "a sentence up to the maximum of the discretionary extended-term range based on statutory eligibility as a persistent offender." Pierce, 188 N.J. at 158, 167-68. Limited to a role in the court's application of aggravating and mitigating factors after the defendant has been found eligible for an extended term, the court's factfinding as to public safety does not offend the Sixth Amendment. See ibid. Indeed, as we recently noted in a sentencing appeal involving judicial factfinding to set a period of parole ineligibility, "[r]equiring the finding of aggravating factors to justify a sentence within the prescribed range does not transform those factors into the substantial equivalent of elements of an offense to be decided by a jury." State v. Kiriakakis, 235 N.J. 420, 437 (2018).

"[O]nce the court finds that [the] statutory eligibility requirements are met, . . . the range of sentences, available for imposition, starts at the minimum of the ordinary-term range and ends at the maximum of the extended-term range." Pierce, 188 N.J. at 169. As we noted in Pierce,

> [w]here, within that range of sentences, the court chooses to sentence a defendant remains in the sound judgment of the court -- subject to reasonableness and the existence of credible evidence in the record to support the court's finding of aggravating and mitigating factors and the court's weighing and balancing of those factors found.
>
> [Ibid.]

When a court weighs aggravating and mitigating factors, the judge exercises "a far-ranging discretion as to the sources and types of evidence used to assist him or her in determining the kind and extent of punishment to be imposed." State v. Davis, 96 N.J. 611, 619-20 (1984). The court is not limited by the rules of evidence, see N.J.R.E. 101(a)(2)(C), and "evaluates 'a range of information unconstrained by evidential considerations,'" Fuentes, 217 N.J. at 72 (quoting State v. Randolph, 210 N.J. 330, 348 (2012)). However, "[t]he finding of any factor must be supported by competent, credible evidence in the record." State v. Case, 220 N.J. 49, 64 (2014).

## C.

### 1.

The parties agree that defendant qualified as a "persistent offender" for purposes of N.J.S.A. 2C:44-3(a); accordingly, he was statutorily eligible for a discretionary extended term. As defendant concedes, his twenty-year extended-term sentence is within the range between the five-year minimum of the ordinary-term range for a second-degree offense, N.J.S.A. 2C:43-6(a)(2), and the twenty-year maximum of the extended-term range for that offense, N.J.S.A. 2C:43-7(a)(3). Accordingly, the trial court's eligibility determination is not before the Court in this appeal.

Rather, defendant bases the appeal of his sentence on the trial court's application of aggravating factors three, six, and nine to reach the upper end of that sentencing range. He challenges the court's consideration of those factors in two respects. First, defendant asserts that the court improperly cited his conduct relating to charges on which the jury deadlocked because it sought to reverse what it considered an unjust verdict, thus adjudicating him guilty of offenses as to which the jury did not convict him. Second, defendant objects to the court's "duplicative" reliance on his criminal record both to deem him statutorily eligible for an extended term and to find aggravating factors six and nine. We consider each contention in turn.

36

2.

When a judge presides over a jury trial regarding multiple offenses, he or she has the opportunity to evaluate the credibility of witnesses and to assess the evidence presented as to each of those offenses. If a jury is unable to return a verdict as to some offenses and convicts the defendant of others, and the State requests that the court consider evidence presented as to offenses on which the jury deadlocked, such information may constitute competent, credible evidence on which the court may rely in assessing the aggravating and mitigating factors. See Case, 220 N.J. at 63-65. No Sixth Amendment or other constitutional principle, or statutory provision, generally bars a court from considering such evidence. And consideration of competent evidence presented in support of charges -- even if the jury does not go on to convict defendant on those charges -- does not raise concerns about drawing inferences from the mere fact that charges had been brought, a practice we found improper in State v. K.S., 220 N.J. 190 (2015).

Nevertheless, we have two concerns about the court's reliance on evidence pertaining to the four transactions as to which the jury deadlocked in this appeal.[7] First, the charges relating to those four transactions were still

---

[7] There is no indication in the trial or sentencing record that the trial court considered the jury's verdict to be unjust, or otherwise demonstrated a lack of

37

pending when the court sentenced defendant and were not dismissed until the end of the hearing, moments after the court imposed the sentence. The record does not reveal whether the State had advised the court and defense counsel that it would move to dismiss the remaining charges immediately after sentencing. The trial court should have denied the State's request to consider evidence relevant to those charges, and should not have opined about the defendant's guilt with respect to those charges, while the charges remained pending. We caution courts not to consider evidence pertaining to charges as to which a jury deadlocked in sentencing unless and until the defendant no longer faces the prospect of prosecution for those charges.

Second, the trial court's reliance on Watts was misplaced. In Watts, which involved a sentencing court's reliance on evidence presented as to a charge on which the defendant was acquitted, the United States Supreme Court did not confront the deadlocked-jury issue raised by this case.

We concur, however, with the Appellate Division's view that the evidence pertaining to charges on which the jury deadlocked was not dispositive in defendant's sentencing. Indeed, when it found aggravating factor three, the trial court did not refer at all to those charges. When the court

respect for its determination. Accordingly, the Appellate Division's decision in Tindell, 417 N.J. Super. at 556, is inapposite.

38

found aggravating factors six and nine, it emphasized other factors such as defendant's prior record, the failure of prior probationary sentences to deter defendant, the serious nature of the offenses of which defendant was convicted, and the State's strong policy to protect the public with strict gun control laws.

Although the trial court should have declined to consider defendant's conduct in the charges that did not lead to a conviction unless the State moved to dismiss those charges prior to the imposition of sentence, the court's reliance on such conduct as one of several factors supporting two of the three aggravating factors does not warrant resentencing.

3.

We find no error in the trial court's reliance on defendant's criminal record both to determine defendant's "persistent offender" status under N.J.S.A. 2C:44-3(a) and to support the court's finding of aggravating factors three, six, and nine. Indeed, in our decision in Pierce, we envisioned that the defendant's criminal record may be relevant in both stages of the sentencing determination. We held that "[a] sentencing court must first, on application for discretionary enhanced-term sentencing under N.J.S.A. 2C:44-3(a), review and determine whether a defendant's criminal record of convictions renders him or her statutorily eligible." 188 N.J. at 168. If so, "whether the court

39

chooses to use the full range of sentences opened up to the court is a function of the court's assessment of the aggravating and mitigating factors, including the consideration of the deterrent need to protect the public." Ibid. In that crucial inquiry, defendant's prior record is central to aggravating factor six, N.J.S.A. 2C:44-1(a)(6), and may be relevant to other aggravating and mitigating factors as well. See N.J.S.A. 2C:44-1(a) and (b); see also State v. McDuffie, 450 N.J. Super. 554, 576-77 (App. Div. 2017) (rejecting, "as lacking merit," the defendant's claim that the sentencing court "impermissibly double-counted his criminal record, when granting the State's motion for a discretionary extended term, and again, when imposing aggravating factor six, which considers the extent and seriousness of a defendant's prior record").[8]

Accordingly, the trial court properly considered defendant's criminal record in deciding defendant's statutory eligibility for an extended term, and in weighing aggravating and mitigating factors to determine that such a term was warranted.

V.

The judgment of the Appellate Division is affirmed as modified.

---

[8] We do not reach the ACLU's contention that the trial court improperly considered defendant's lack of remorse or his "sovereign citizen" status, as defendant did not raise those arguments. See State v. J.R., 227 N.J. 393, 421 (2017) ("This Court does not consider arguments that have not been asserted by a party, and are raised for the first time by an amicus curiae.").

40

JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PATTERSON'S opinion.  CHIEF JUSTICE RABNER filed an opinion concurring in part and dissenting in part, in which JUSTICE TIMPONE joins.  JUSTICE ALBIN filed a dissenting opinion.

State of New Jersey,

Plaintiff-Respondent,

v.

Kareem T. Tillery, a/k/a
Kareem Ali Tillery, Kareem A. Tillery,
Kareem J. Tillery, Karim Tillery,
Kariem A. Tillery, Kareem Tillery-Jones
and Kareem R. Jones,

Defendant-Appellant.

CHIEF JUSTICE RABNER, concurring in part and dissenting in part.

For the reasons outlined in the dissent, I cannot find that defendant waived his <u>Miranda</u> rights either explicitly or impliedly. <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). In my view, it was therefore error to introduce defendant's post-arrest statements at trial.

Only in very rare circumstances can that type of error survive under a harmless error analysis. As this Court has observed, certain

> "constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error." <u>Chapman v. California</u>, 386 U.S. [18, 23 (1967)]. <u>See, e.g.</u>, <u>Payne v. Arkansas</u>, 356 U.S. 560 (1958) (coerced confession); <u>Gideon v. Wainwright</u>, 372 U.S. 335

1

(1963) (right to counsel); <u>Tumey v. Ohio</u>, 273 U.S. 510 (1927) (impartial judge).

[<u>State v. McCloskey</u>, 90 N.J. 18, 30 (1982).]

Here, the error implicates a different constitutional violation. As a result, the error must be "harmless beyond a reasonable doubt" for defendant's conviction to stand. <u>State v. Maltese</u>, 222 N.J. 525, 543-44, 550 (2015). "The test . . . 'is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" <u>State v. Sanchez</u>, 129 N.J. 261, 278 (1992) (quoting <u>Chapman</u>, 386 U.S. at 23).

That standard is a "stringent" one, <u>ibid.</u>, and "any doubts" about a statement's potential for prejudice "must be resolved against the State," <u>McCloskey</u>, 90 N.J. at 30. <u>See also</u> <u>R.</u> 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . .").

In this case, there is overwhelming evidence that defendant sold a .38 caliber handgun on April 3, 2013: An informant met face-to-face with defendant to buy the firearm. The two discussed the transaction and, in the course of doing so, referred to a "loaded," "cocked," "three eight" (.38) caliber weapon. Their conversation was captured on tape. And a law enforcement officer watched both men from nearby while the transaction took place. Immediately afterward, an officer recovered a loaded .38 caliber handgun from

2

the informant. The informant also testified at trial and confirmed that he bought the loaded weapon from defendant.

Under the circumstances, defendant's conviction was not "substantially dependent upon [his] statement to [the] police." Maltese, 222 N.J. at 550. Unlike in State v. O'Neill, 193 N.J. 148, 184 (2007), the statement here -- described in the majority opinion, see ante at ___ (slip op. at 30-32) -- was not "central[] . . . to the prosecution's case." The conviction instead rested on proofs that were hard to refute: recorded statements of the gun transaction as it took place, contemporaneous observations by the police, and physical evidence -- the gun itself. For those reasons, I believe this is one of the very rare cases in which the erroneous admission of a defendant's post-arrest statement amounts to harmless error.

I do not consider or draw inferences from the jury's inability to reach a verdict on the other counts. See Yeager v. United States, 557 U.S. 110, 125 (2009) ("[T]he fact that a jury hangs is evidence of nothing -- other than, of course, that it has failed to decide anything."); accord State v. McKinney, 223 N.J. 475, 487 (2015).

I therefore respectfully concur in part and dissent in part.

SUPREME COURT OF NEW JERSEY
A-37 September Term 2017
079832

State of New Jersey,

Plaintiff-Respondent,

v.

Kareem T. Tillery, a/k/a
Kareem Ali Tillery, Kareem A. Tillery,
Kareem J. Tillery, Karim Tillery,
Kariem A. Tillery, Kareem Tillery-Jones
and Kareem R. Jones,

Defendant-Appellant.

JUSTICE ALBIN, dissenting.

This Court granted certification to decide whether the police secured a confession in violation of defendant's right against self-incrimination. The majority, however, dodges answering the question whether the State proved that defendant validly waived his Miranda rights. The majority laments the poor police practice that evidently did not establish whether defendant had a full understanding of those rights. The majority also makes repeated concessions that logically lead to the inescapable conclusion that the State failed to prove beyond a reasonable doubt that defendant made a knowing, intelligent, and voluntary waiver of his rights.

1

Instead of answering the critical question of whether the police elicited the confession by impermissible means, the majority takes a shortcut by assuming that the confession was wrongly admitted into evidence. It then engages in an analysis at odds with our jurisprudence and declares that wrongly admitting the confession -- the most damning piece of evidence entered at trial -- was harmless error, an error that could not possibly have altered the verdict. In straining to uphold the verdict, the majority downplays the power of defendant's audio-recorded confession, which the jury twice asked to be replayed during its four days of deliberations; overvalues the credibility of the State's key witness, a desperate informant who had multiple criminal charges pending that could have landed him in prison for decades but whose cooperation with the State earned him a probationary sentence; and exaggerates the strength of the State's case, which resulted in the jury hanging on most of the counts in the indictment.

The use of the harmless error doctrine in this fashion cannot be reconciled with our jurisprudence. It renders ineffectual the exclusionary rule and reduces the right against self-incrimination to a form of words. It suggests that upholding a conviction is more important than upholding constitutional rights.

I dissent because the record is clear that the State did not prove a valid waiver of rights. I dissent because our case law and the facts of this case tell us that defendant's unconstitutionally elicited confession does not satisfy the harmless error doctrine.

## I.

The State bears the burden of proving beyond a reasonable doubt that a defendant made a knowing, intelligent, and voluntary waiver of his Miranda rights before the commencement of a custodial interrogation. State v. Presha, 163 N.J. 304, 313 (2000); see also Miranda v. Arizona, 384 U.S. 436, 475 (1966).[1] To prove that a defendant waived his Miranda rights -- either explicitly or implicitly -- the prosecution must show that the defendant "understood" his rights before waiving them. Berghuis v. Thompkins, 560 U.S. 370, 383-84 (2010); see also North Carolina v. Butler, 441 U.S. 369, 373 (1979) (noting that a waiver of Miranda rights need not be explicit but may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver" (emphasis added)). Showing "that a Miranda warning was given and the accused made an uncoerced

---

[1] Federal law only requires prosecutors to prove by a preponderance of the evidence that a suspect's waiver of rights was knowing, intelligent, and voluntary. See Colorado v. Connelly, 479 U.S. 157, 168 (1986).

3

statement . . . standing alone, is insufficient to demonstrate 'a valid waiver' of Miranda rights."  Berghuis, 560 U.S. at 384 (quoting Miranda, 384 U.S. at 475).  But that is exactly what occurred here.

The State did not establish that defendant understood his rights before waiving them.  The State merely showed that the interrogating officer read the Miranda rights to defendant, who then signed a card confirming that the officer had done so.  At no point did the officer take any steps to ensure that defendant understood the rights read to him.  The officer admitted that he did not ask defendant whether he understood his rights or even ask him to read the rights aloud.[2]  Significantly, the officer did not ask defendant whether he waived his rights, evidently because the Miranda rights card did not have a waiver-of-rights provision.  Without elaboration, the officer directed defendant to sign the back of the card -- "[j]ust sign here that I read you your rights" -- and advised him that "[b]y signing [the Miranda card] you are not admitting you're guilty or anything [it's] just that I read you your rights."  The officer wrongly assumed that because defendant continued to speak, he must have understood his rights and therefore knowingly, intelligently, and voluntarily waived them.

The majority essentially agrees with this recitation.  The majority

---

[2]  When asked if he witnessed Tillery read the Miranda card, the officer testified that Tillery took possession of it and looked at it in silence; the officer did not confirm whether Tillery read it to himself before signing it.

4

acknowledges that the <u>Miranda</u> rights card "did not guide an interrogating officer . . . to ensure that the suspect had waived those rights before questioning began," <u>ante</u> at ___ (slip op. at 25-26); that "the <u>Miranda</u> card used in this case invited an incomplete inquiry on the question of waiver," <u>ante</u> at ___ (slip op. at 26); and that "the card ambiguously stated that by signing, the suspect acknowledged that he or she had been 'advised of the constitutional rights found on the reverse side of this card,'" <u>ibid.</u>  In light of those admissions, the majority's concession that "the <u>Miranda</u> card used by the New Jersey State Police investigators does not reflect optimal law-enforcement practice" is an understatement.  <u>See</u> <u>ante</u> at ___ (slip op. at 25).  Complying with <u>Miranda</u> is not burdensome.  Indeed, some law enforcement agencies include on the <u>Miranda</u> form a question, "Do you understand?" and a waiver-of-rights provision.  <u>See, e.g.</u>, <u>State v. A.M.</u>, 237 N.J. 384, 390 (2019) (discussing a <u>Miranda</u> form prepared by the Bergen County Prosecutor's Office).

The <u>Miranda</u> waiver issue is not "a close question," as the majority apparently believes, and even if it were, the State has not satisfied its heavy burden of proving a knowing, intelligent, and voluntary waiver of rights beyond a reasonable doubt.  Sidestepping the issue, as the majority does, deprives the bench, bar, and law enforcement of the clarity needed in this area

5

of the law.  In short, I would hold that the State's failure to prove beyond a reasonable doubt that defendant knowingly, intelligently, and voluntarily waived his rights requires the suppression of his confession.

II.

A.

In New Jersey, the admission of an unconstitutionally secured confession is rarely found to be harmless error.[3]  That is because "[a] confession is like no other evidence."  See Arizona v. Fulminante, 499 U.S. 279, 296 (1991).  The United States Supreme Court has explained that

---

[3]  See, e.g., State v. Wint, 236 N.J. 174, 205-06 (2018) (remanding for a new trial because the erroneous admission of the defendant's statement that he "committed a murder in Camden" was "clearly capable of causing an unjust result"); State v. Maltese, 222 N.J. 525, 549-50 (2015) (remanding for a new trial when the defendant's convictions were "substantially dependent upon defendant's statement to police" which had been improperly admitted); State in re A.S., 203 N.J. 131, 153 (2010) (remanding for a new trial since the Court could not "say that there was no reasonable possibility that [the confession's improper] introduction into evidence contributed to the delinquency adjudication"); State v. O'Neill, 193 N.J. 148, 184 (2007) (reversing the defendant's conviction "[g]iven the centrality of defendant's [erroneously admitted] incriminating statements to the prosecution's case"); State v. Pillar, 359 N.J. Super. 249, 279-80 (App. Div. 2003) (refusing to find the erroneous admission of the defendant's confession harmless despite "overwhelming untainted evidence of defendant's guilt" because his "admission likely played a part in his conviction").  But see State v. Shelton, 344 N.J. Super. 505, 517-18 (App. Div. 2001) (determining the erroneous admission of the defendant's written confession was harmless because the defendant's oral confession was properly admitted and "both the oral and written statements were the same in terms of inculpating defendant").

6

the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so. While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision.

[Ibid. (alterations in original) (internal citations and quotation marks omitted).]

When such powerful evidence touching on a defendant's substantial rights is erroneously entered into evidence, the burden is on the State to prove that the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 23-24 (1967); see also State v. Macon, 57 N.J. 325, 340-41 (1970) (adopting the standard set forth in Chapman). "The test for determining whether an error is harmless 'is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" State v. Sanchez, 129 N.J. 261, 278 (1992) (emphasis added) (quoting Chapman, 386 U.S. at 23). Thus, the State has to establish beyond a reasonable doubt that that there was no "reasonable possibility" that the

7

wrongly admitted confession "might have contributed to [his] conviction." See ibid. That conclusion cannot be reached here.

This Court has held that "certain constitutional errors so impugn the integrity of our system of justice that any doubts about their prejudice to the defendant must be resolved against the State, which seeks the benefits of its constitutional wrongdoing." State v. McCloskey, 90 N.J. 18, 30 (1982). One such constitutional error is the admission of an unlawfully elicited confession. Id. at 30-31.

There are "two important reasons for applying harmless error doctrine sparingly" when the State violates a "defendant's privilege against self-incrimination." Id. at 31. First, the protection that the privilege affords in "our accusatory system of justice requires us to guard carefully against its infringement." Ibid. "Second, the improper use of incriminating statements made by a criminal defendant has great potential for prejudice." Ibid.; see also Fulminante, 499 U.S. at 296. The underlying judicial assumption is "that inculpatory remarks by a defendant have a tendency to resolve jurors' doubts about a defendant's guilt to his detriment" and that the credibility of eyewitness testimony is bolstered by a defendant's confession. McCloskey, 90 N.J. at 31.

The ultimate question is not whether the State presented "sufficient

evidence" for a reasonable jury to convict a defendant, "absent the unlawfully obtained statements." See id. at 32. Rather, the question is whether the Court is "able to declare a belief that [the error] was harmless beyond a reasonable doubt." Ibid. (alteration in original) (quoting Chapman, 386 U.S. at 24).

Three cases illustrate how sparingly this Court has found the admission of an unlawfully elicited confession to constitute harmless error. In State v. Johnson, the defendant was convicted of the brutal and heinous murders of a husband and wife in their home, based on evidence that included the defendant's confession. 120 N.J. 263, 267, 273 (1990). The defendant had admitted to the murders after a prolonged custodial interrogation. Id. at 271-73, 284. This Court, however, determined that the defendant's confession was obtained in violation of his Fifth Amendment right against self-incrimination. Id. at 284. In engaging in the harmless error analysis, this Court "acknowledge[d] that that evidence of defendant's guilt [was] persuasive." Id. at 291.[4] The Court nevertheless concluded that despite "the substantial evidence of guilt, . . . the improper admission of defendant's confession

---

[4] The evidence of the defendant's guilt included testimony that his friends encountered him on the day of the murder "smeared with blood" and that he was seen riding a bike near the murder scene. Id. at 291. The State also presented forensic evidence that "a footprint found at the scene matched defendant's sneaker" and that "blood found on defendant's sneaker lace appeared to match that of the victim." Ibid. The jury also heard testimony that the defendant possessed jewelry stolen from the home. Ibid.

'impact[ed] substantially and directly' on the fundamental procedural right to remain silent, and is 'not amenable to harmless error rehabilitation.'" Ibid. (second alteration in original) (quoting State v. Czachor, 82 N.J. 392, 404 (1984)). Because "[d]efendant's confession was so powerful and so damaging to his defense," the Court refused to speculate whether the remaining evidence would have been sufficient to convict "had the confession been properly excluded." Id. at 291-92. It therefore concluded that the admission of the confession was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Id. at 292 (quoting Czachor, 82 N.J. at 402).

In State v. McCloskey, a jury convicted the defendant of murder and related weapons offenses, based on evidence that included the defendant's confession. 90 N.J. at 18, 20. That confession, this Court concluded, was elicited in violation of the defendant's Fifth Amendment right against self-incrimination because the interrogating officer did not honor his invocation of his right to counsel. Id. at 27-29. The Court then engaged in a harmless error analysis. Id. at 30-32.

The Court conceded that even without the defendant's confession, "the State ha[d] sufficient evidence so that a reasonable jury might convict him." Id. at 32. But that is not the test for determining whether the erroneous

10

admission of a confession is harmless. The true test for determining whether the wrongful admission of a confession requires reversal of a conviction "depends finally upon some degree of possibility that it led to an unjust verdict." Id. at 30 (quoting Macon, 57 N.J. at 335). With that test in mind, the Court held that it was "not 'able to declare a belief that [the error] was harmless beyond a reasonable doubt'" and reversed the defendant's conviction. Id. at 32 (alteration in original) (quoting Chapman, 386 U.S. at 24). In reaching that conclusion, the Court repeated its warning from an earlier case about the danger of the "overuse of the 'harmless error' doctrine." Id. at 30 (citing Czachor, 82 N.J. at 404). It further noted that "[e]rrors impacting directly upon . . . sensitive areas of a criminal trial are poor candidates for rehabilitation under the harmless error philosophy" and therefore "the rule of harmless error should be summoned only with great caution in dealing with the breach of fundamental procedural safeguards 'designed to assure a fair trial.'" Id. at 30 (second alteration in original) (quoting State v. Simon, 79 N.J. 191, 206 (1979) (citations omitted)).

In State v. Sanchez, the "stringent standard" for harmless error set forth in Chapman -- "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" -- also led the Court to reverse a murder conviction because of the wrongful admission of the

11

defendant's confession.  129 N.J. at 278 (quoting Chapman, 386 U.S. at 23).

Despite the State's "evidence of defendant's guilt [that] flowed

overwhelmingly from the eyewitnesses' accounts of the murder," the Court

nevertheless was "left uncertain whether the error may have contributed to

defendant's conviction" and therefore was compelled to grant a new trial.

Ibid.

Even under Chapman's "stringent standard," harmless error will be

found in some rare cases involving the erroneous admission of a confession.

Milton v. Wainwright, 407 U.S. 371 (1972), is one example, but even there the

United States Supreme Court was sharply split.  In Milton, a Florida jury

convicted the defendant of murder based on evidence that included four full

confessions.  Id. at 372-73.  On appeal from the denial of his petition for

habeas corpus, the Supreme Court considered the defendant's challenge only

to his fourth confession, which was "essentially the same as" his three prior

confessions.  Id. at 375-77.  The fourth confession was made to a police

officer, posing as a prisoner in a jail cell, after the defendant was indicted and

represented by counsel.  Id. at 372.  The Court assumed that the fourth

confession should have been excluded but concluded that its admission was

harmless beyond a reasonable doubt.  Ibid.  The Court reached that conclusion

because "[t]he jury . . . was presented with overwhelming evidence of

petitioner's guilt, including <u>no less than three full confessions</u> that were made by petitioner prior to his indictment." <u>Id.</u> at 372-73 (emphasis added). Even so, three members of Court joined Justice Stewart's dissenting opinion, which chided the majority for refusing "to rule on the constitutional question squarely presented" and which maintained that "[s]urely there is <u>at the least</u> a reasonable doubt whether" the erroneously admitted testimony of the police officer posing as a cellmate contributed to the verdict. <u>Id.</u> at 384 (Stewart, J., dissenting).[5]

Unless we discard more than three decades of our jurisprudence, the facts before us do not allow a finding that the erroneous admission of defendant's confession is harmless beyond a reasonable doubt. Put more precisely, the State has failed to prove that there is no "reasonable possibility that the evidence complained of might have contributed to the conviction." <u>Sanchez</u>, 129 N.J. at 278 (quoting <u>Chapman</u>, 386 U.S. at 23).

B.

---

[5] Another rare case is <u>State v. O'Neal</u>, 190 N.J. 601, 606-07 (2007), where police officers made a custodial stop of the defendant after witnessing him engage in a drug transaction. Without administering <u>Miranda</u> warnings, the officers asked him what was in his bulging sock, to which he replied, "cocaine." <u>Id.</u> at 607. Although the defendant's statement should have been suppressed at trial for the <u>Miranda</u> violation, we found the error harmless because "[t]he police had probable cause to search and arrest defendant prior to asking the offending question and would have discovered the cocaine when they searched the sock." <u>Id.</u> at 616.

13

During the interrogation by Detective Ribeiro, defendant confessed to selling guns to the State's informant, a cooperating witness who had multiple pending charges against him. In his confession, defendant acknowledged that he set up the gun sales and earned one hundred dollars for each transaction. The confession encompassed significant details about the April 3 transaction that aided the State in convicting him of that offense, details such as "the difficulty that he encountered paying the unidentified individual who supplied the weapon, and the modest profit that he made on the sale." Ante at ___ (slip op. at 10-11).

With the confession, the State not only had admissions of guilt from the lips of defendant, but also had evidence to corroborate its informant, the spotty audio-recordings of the gun transactions, and the surveillance. Corroborating the credibility of the testifying informant was the key to the State's case. As a cooperating witness, the informant had a strong incentive to bring in defendant in exchange for bringing down his jail exposure on the multiple criminal charges pending against him. At the time of his cooperation with the police, the informant -- who had a prior criminal record -- faced seven counts of burglary and one count of attempted burglary in Bergen County, exposing him to a potential forty-year prison term, and three counts of burglary and one count for criminal mischief in Passaic County, exposing him to a potential

14

twenty-year prison term.  After defendant's arrest, the informant pled guilty to charges in Bergen and Passaic Counties and received probationary sentences. He also received cash payments every time he presented the police with a purchased gun.

Jurors are charged that they may consider a cooperating witness's "special interest in the outcome of the case" and whether his testimony was "influenced by the hope or expectation of any favorable treatment or reward." Model Jury Charges (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006); see also State v. Adams, 194 N.J. 186, 207-08 (2008).  One can reasonably surmise that the informant's credibility was on shaky grounds because the jury hung on all counts related to four of the five gun transactions.  The majority improperly assumes that the jury would have accepted his testimony as credible, even without defendant's corroborating confession.  See McCloskey, 90 N.J. at 31 ("[I]nculpatory remarks by a defendant have a tendency to resolve jurors' doubts about a defendant's guilt to his detriment" and boost the credibility of eyewitness testimony.).

The majority, moreover, does not take account of the four days of jury deliberations; instead it makes its own factfinding determination that the evidence against defendant in the April 3 gun transaction "was overwhelming."  The "overwhelming" evidence standard used by the majority,

15

however, is not a substitute for the harmless error standard.

We do not have to speculate about the importance of defendant's confession to the State in presenting its case or to the jury in deliberating toward a verdict. During summation, the prosecutor reminded the jury to consider defendant's own admissions. During its four days of deliberation, the jury asked twice for defendant's audio-recorded confession to be replayed. For harmless error purposes, the issue is not whether the State presented sufficient evidence to convict on the April 3 gun transaction. The jury had sufficient evidence to convict on all five gun-sale transactions, even without defendant's confession, if it chose to credit the State's witnesses and evidence. But "confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." Fulminante, 499 U.S. at 296.

As a result of the erroneous admission of illicitly secured confessions, this Court reversed murder convictions in Johnson, despite "substantial evidence of guilt," 120 N.J. at 267, 291-92, and a murder conviction in McCloskey, despite "sufficient evidence" to convict, 90 N.J. at 20, 32; see also Sanchez, 129 N.J. at 278-79. Our Court granted new trials under the Chapman/Macon harmless error standard because of the "reasonable possibility" that the unlawful confessions "might have contributed to the

16

conviction." <u>Sanchez</u>, 129 N.J. at 278-79 (quoting <u>Chapman</u>, 386 U.S. at 23); <u>see also</u> <u>McCloskey</u>, 90 N.J. at 30, 32; <u>Johnson</u>, 120 N.J. at 291-92 (applying <u>Macon</u> to hold the confession was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached" (quoting <u>Czachor</u>, 82 N.J. at 402)). So long as there is "some degree of possibility that [a wrongly admitted confession] led to an unjust verdict," this Court is constrained to reverse. <u>See</u> <u>McCloskey</u>, 90 N.J. at 30 (quoting <u>Macon</u>, 57 N.J. at 335).

### III.

This Court has cautioned about the "overuse of the 'harmless error' doctrine" because of its capacity to undermine the primacy of the jury as the ultimate factfinder in our system of criminal justice. <u>See</u> <u>ibid.</u> To conclude that there was not some degree of possibility that defendant's confession -- the "most knowledgeable and unimpeachable source of information," <u>Fulminante</u>, 499 U.S. at 296 -- might have contributed to the jury's verdict requires a disregard of not only a whole body of jurisprudence, but also the flaws in the State's case that led the jury to hang on most of the charges. To be clear, the failure to reverse defendant's conviction violates the federal harmless error standard, <u>see</u> <u>Chapman</u>, 386 U.S. at 24, and therefore the Fifth Amendment.

Our jurisprudence teaches us that eroding a fundamental constitutional

17

right is too high a price to pay for saving a conviction. The majority has chosen not to heed that lesson. In the end, the State did not prove that the admission of defendant's confession was harmless beyond a reasonable doubt.

I therefore respectfully dissent.